Steel and Nucor and Gallatin Steel and others v. United States and Corus, 2009, 15, 72, and 73. We're going to hear from Mr. Gerrish first, and you are arguing for U.S. Steel. That's correct, Your Honor. May it please the Court, this case presents an issue, a first impression that is of absolutely critical importance to the antidote. First impression? That's correct, Your Honor. It is an issue of first impression. We've decided several cases in which said that the statute doesn't speak one way or the other on zero. Your Honor, your prior decisions have considered other provisions of the statute. They are not a binding precedent in this case as to the issue we are presenting. The two cases that are the key cases that you've decided are the Timken case and the Corus I case. In Timken, this Court considered and relied solely on the statutory definitions of dumping margin and weighted average dumping margin in section 1677.35 of the statute. That case cannot possibly constitute binding precedent on whether section 1677.F1D of the statute was never even presented to the Court, much less decided by the Court in its decision. And the Court's reference in its decision to the statute not correctly speaking to zeroing is a general expression in broad language that under this Court's clear case law does not constitute binding precedent. But then doesn't that leave it to the discretion of the agency? No, Your Honor, it does not because the provisions of section 1677.F1D require that it use zero. Well, the statutory language doesn't say that. There's nothing in the legislative history of that provision in the 1994 amendments that speaks to it, is there? Well, in 1994... Is there anything in the legislative history that speaks to zeroing? There is nothing in the legislative history that speaks to zeroing, Your Honor, and actually I think that alone is actually significant because Commerce used zeroing for decades prior to the Uruguay Round Agreements Act, and there was no... So they assumed that zeroing would probably continue. That may have been the assumption in 1994, but that's not the same thing as requiring that it continue, is it? But in 1994, what Congress did as a result of the Uruguay Round negotiations was to change U.S. law and to do... No, no, but what's the answer to my question? The fact that they... You may have shown that they assumed in 1994 that zeroing would continue because otherwise why would they think there was any significance to change to an average-to-average from an average-to-transaction comparison, but why does that assumption that zeroing would continue amount to a direction that it continued? Well, they dictated, Congress dictated in Section 1677 F1D that weighted average U.S. prices would be used in all normal investigations, and that was a change. I understand, but what's the answer to my question? Why can't it just be that they assumed that Congress would continue to use zeroing rather than that they directed it? There are two possibilities. One of them is just an assumption, and one of them is a direction. Otherwise, if they weren't requiring that zeroing be used, then their change in the statute in requiring that weighted average U.S. prices be used to calculate dumping margins would be absolutely meaningless. It would only be absolutely meaningless if Congress changed its mind about zeroing. It would be meaningful if they continued. And that's exactly why the change in the statute shows that Congress was requiring zeroing, because otherwise they would not have had any reason to change the statute. It would have had effect whatsoever for them to do so, because they were clearly anticipating that there would be different margin results using either weighted average U.S. prices, which is what they required in Section 1677 F1D, or transaction-specific U.S. prices, which were used under the old law, but which Congress was saying are forbidden. Thank you for responding to my question, which was why doesn't that just reflect an assumption that Congress would continue to use zeroing? Well, it reflects that their understanding that Congress would continue to use zeroing, and if Congress did not continue to use zeroing, then their change in the statute in 1994 would be rendered completely meaningless. So what's the big deal about that? If the assumption on which they're working, if the administrative approach changes, the statute doesn't have any significance. What's the problem with that? Well, this Court and the Supreme Court have been very clear that you cannot interpret a statute to render meaningless even a single word or phrase in the statute. It's not rendered meaningless. It still has meaning if Congress continues to use zero, and if the agency changes its mind, then it doesn't have meaning. But that's not to say that the whole statute is devoid of meaning. It has an important purpose if Commerce continues to use zeroing. I think, Your Honor, that's exactly right, though. It only has meaning if Commerce continues to use zeroing. If they do not continue to use zeroing, then that statutory provision is completely devoid of meaning. Its meaning is completely nullified. But this statute is devoid of meaning if Commerce doesn't use or discontinues using zeroing in all of its analyses. Actually, if you consider each one of the different scenarios in this section of the statute, and if you specifically focus on normal investigations without targeted dumping, which is the type of investigation we have in this case, if Commerce does not use zeroing, you get the same margin result regardless of whether you use weighted average U.S. prices or transaction-specific U.S. prices. Weighted average prices were what were required in the statute. You'd get a different answer if zeroing were used for weighted averaging as compared to the normal analysis. You would get a different result if you use zeroing based on whether you use weighted average U.S. prices or transaction-specific U.S. prices. That would result in a different margin. In a normal analysis. In a normal investigation, that is correct. But what about the other two scenarios in 1677 F1D? Well, if you consider each one of those on its own, if you consider administrative reviews, which is another of the scenarios, the statute specifies that transaction-specific U.S. prices are to be used and forbids weighted average U.S. prices. However, if you don't use zeroing in an administrative review, you get the same exact margin result regardless of whether you use weighted average U.S. prices or transaction- Again, that provision of the statute would be nullified as well. So this pertains to each one of the scenarios in the statute. Now, what the other side has argued on this is to say, well, we're wrong in saying that you would get the same result in a normal investigation that you would get in a targeted dumping investigation if you don't use zeroing. That is not our argument. Our argument is not based on a comparison of the results that you get in a normal investigation versus a targeted dumping investigation. Our analysis is based on simply just look at what would happen in a normal investigation. If you consider that on its own, commerce would get the same result if it does not zero whether it uses weighted average U.S. prices, which the statute requires, or transaction-specific U.S. prices, which is what was- I don't understand. Commerce was using zeroing before, now is not using zeroing, and there's a different answer. There's a different result. Well, it is a different result, but now that they're not using zeroing, you would get the same exact result regardless of the basis for U.S. price, whether you use weighted average U.S. prices without zeroing or transaction-specific prices without zeroing. You get exactly the same result, and that completely nullifies the change in the statute that was made by Congress. Mr. Garish, you're splitting your time with Mr. Brightfield, and you want to save a couple of minutes? That is correct, Your Honor. So we'll save a couple of minutes for you and hear Mr. Brightfield for a new court. Thank you, Your Honor, and may it please the Court. As an initial matter, we do concur with all of the arguments just presented by Mr. Garish, but in addition, commerce's elimination of zeroing must also be reversed because U.S. law does not allow it. In particular, the Tariff Act requires zeroing, and the interpretation adopted by commerce and by this Court in Timken is inconsistent with the statute we respectfully submit, inconsistent with how other appeals courts have ruled on this statutory language, and inconsistent with how— How can we second-guess the earlier decision? As a panel, we're bound by them. I mean, you may want to ask for an in-bank on this, but as a panel, we can't do anything to help you. Your Honor, that's correct. If you— We're asking you to revisit Timken, and that would have to be done in an en banc process. I will point out, though, that the Timken Court wrestled with this question and found that it was a very close question as to whether or not zeroing was of the statutory problem and why we think it was not correctly decided the first time around. Because the U.S. law, in our view, is unambiguous, it was improper for commerce to use Section 129 to eliminate zeroing. Commerce was required to go through Congress to amend the law rather than to try and short-circuit the process. So let me explain why. The statutory definition of dumping margin has only one meaning, and it requires zeroing. Section 167735A defines the term dumping margin as the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise. And in Timken, this Court examined the word exceeds in the definition, said it was a very close question, and then held that that section did not manifestly require zeroing. We do respectfully disagree. In our view, the Federal Circuit's interpretation is not consistent with the plain language of the statute. Is this an argument you have to save for another day? It's not an argument that we can accept. It's an argument we have to make, to prevail, we would have to prevail en banc. Your Honor, that's correct. What you're saying is you want to persuade us of the incorrectness of Timken and ask us to have to ask the Court en banc to review it. I think it's worthy of this Court's consideration, and if this Court determines that to reverse Timken en banc is required, that is correct, Your Honor. Just to give some context, the word exceed has only one meaning in the statute, and that is to be more than, or greater than, or to surpass. We submit it has only one meaning for purposes of the definition of dumping margin. It has only one meaning for purposes of the dumping law, and it only has one legal meaning from the U.S. Constitution, Article I, Section 2, Clause 3, on down through all U.S. laws and regulation and case law. Constitution uses the word exceeds? It does. Article I, Section 2, Clause 3 says that the number of representatives shall not exceed one for every 30,000. We think that the meaning of that provision is clear. We think the meaning of the provision in 35A is also clear, and we would say that the mathematical examples that the Timken Court put together created ambiguity where there really was none. There are also several places in the anti-dumping law itself. But even if you were right about the meaning of exceeds, the definition of weighted average dumping margin talks about an aggregate of dumping margins. So, why in that context can't they aggregate all the transactions without limiting themselves to ones in which they're, in your view, is an excess? Well, because the definition of the terms dumped in dumping make no sense if a dumping margin can exist for sales made at more than fair value. So, you really cannot have a negative number that would be aggregated in the first place. All the numbers that would be aggregated would have to be positive numbers because of that definition of exceeds. Are you saying that individual negative numbers, when averaged, can result in a negative number, and therefore you don't have an exceeds? I'm saying that there is first a calculation made of individual dumping margins, and those margins are only the amount by which the normal value exceeds U.S. price, and that number is a positive number or zero. It does not, it cannot equate to a negative number under the statute. That's correct. I'll also note that for years the U.S. government also argued before this court and others that the anti-dumping law required zeroing in the statute. So, based on that definition of dumping margin, it's not permissible for commerce to calculate a negative margin or to include that value in a weighted average dumping margin, to answer your question, Your Honor. While the WTO has now issued multiple rulings in contradiction, the problem is that U.S. law as it stands requires the practice. And finally, as a matter of practice, I would just point out that this is critically important for purposes of the dumping law. Dumping is potentially injurious whenever it occurs. Just ask you to consider the example of two sales, a sale to Walmart that's dumped, a sale to Target that is non-dumped. The sale to Walmart that is dumped is still injurious to a U.S. industry, regardless of the fact of the non-dumped sale to Target. And there should not be offsetting to the purpose of the dumping law is to address that injury. Mr. Breitbill, we're going to zero your time. That's fair enough, Your Honor. Thank you for your time. Ms. Burke for the government. May it please the court. I'll start first by responding to U.S. Steel's presentation by pointing out that commerce still uses zeroing in most instances. Commerce made a limited change in response to an adverse WTO report, and that change is that when commerce uses average-to-average comparisons in investigations, which it doesn't have to, but when it uses average-to-average comparisons... Isn't it true that in 1994, the Congress must have assumed that zeroing would have continued, right? They didn't say it, but that's a fair assumption, right? I think it's a fair assumption because as Mr. Breitbill has been using it for quite some time, I think it's fair to assume that everyone thought that commerce would continue to do it. I mean, it's certainly not written anywhere, so it's just my assumption and perhaps the court's assumption, but it's a fair one. Right, and so in your view, there's a difference between an assumption and the direction. Yes, as the court has noted, and certainly the parties have noted over the years, zeroing is nowhere written in the statute. It's an unwritten practice even of commerce. It's not written in any particular regulation or anywhere else. This Section 123 notice is the first time that commerce's use of zeroing or not use of zeroing appears anywhere in any kind of formal statement. So it's a methodology that commerce used. It's nowhere written in the statute. It's fair to assume perhaps that Congress thought that commerce would use it, but if Congress didn't see fit to put it in the statute and if Congress was silent on it, then that's a gap in the statute that commerce can fill. How do you deal with the exceeds issue? Well, as you can tell from our brief, we didn't deal with it because we think that if there's anything that is absolutely beyond this court's reach, it is that issue. The court in Timpkins spoke very clearly on this issue, and it said, at least in a mathematical context, exceeds does not unambiguously preclude the calculation of a negative dumping margin. We're bound by that. We think the court is bound by that, and that's what we have to say about it. As Mr. Brightville pointed out, yes, we made the opposite argument for Timpkins. We tried to convince the court that the statute required zeroing and we lost, and now we are bound with this language, which is why we didn't respond directly to it in our brief. This provision, 1677.35a, which defines dumping margin, is the purpose of that to define dumping margin for the calculation of dumping duties on individual transactions? Is that the primary purpose of that definition of dumping margin? Well, the purpose of the definition is to guide commerce's calculation, both in investigations and transactions. I think the court's question, sorry, in investigations and reviews, the court's- I understand that, but once there's a determination that there is dumping by an exporter, then you have to calculate the dumping margin for the individual transaction to determine the amount of duty, right? In an administrative review. The assessment rate and all that. That's correct. So I guess what I'm wondering is whether when 35b talks about aggregate dumping margins, does that necessarily mean that the aggregate dumping margins have to be computed in the same way that the individual dumping margins have to be computed for the assessment of duties? Do I make myself clear? I think so, and I think the- well, let me get the statute out. I think the answer is no, they don't have to be calculated the same way, and I think maybe it's helpful to look at the difference between the calculation in an administrative review versus the way it does it in an investigation. It's helpful in a big picture way to recognize that even when commerce uses zeroing, it uses it differently in an investigation where commerce is using weighted averages on both sides of the transaction versus in an administrative review where commerce is using the weighted average value and just comparing to one export sale. I'm not sure if that answers your question, but I think it depends upon what commerce is doing. I guess what I'm asking is whether even assuming the domestic industry's interpretation of the word exceeds in 35a, is it still not possible that 35b, when it talks about aggregation, allows for the approach that you're now taking? Yeah, I mean, I suppose that's one way to look at it. It's certainly not any- it's not anything that commerce has articulated. It's not an interpretation that commerce has put forth. The way that commerce views the word exceeds is limited only to section 1677-35a in terms of whether commerce thinks that it can use zeroing. I don't think commerce has ever articulated an interpretation of the statute that moves on to section b and made the argument that the court is making, but it's certainly possible. So in commerce's view, the way that it now does the calculations is it goes to the statute, it looks to see what kind of comparison it thinks it should be doing, and then it's guided by this court's determination in Timpkin and Koris. And obviously the court in Timpkin didn't address 1677-f1d, but the court in Koris did. Now it didn't address U.S. Steele's particular argument, although that argument was made to the court. And I'll just point out that the cases on which U.S. Steele relies are cases in which an argument has not even been presented to the court. It hasn't been presented to the court, and then it hasn't been addressed by the court. And in those instances, the court has felt that it is not bound by the previous decision. That's obviously not the case here. Basically what U.S. Steele is saying is that the court did not review the whole statute, which is obviously not the case because Koris specifically mentioned 1677-f1d. I think I may be into Koris's time. No, but if that's what you have to say, then we'll let you stop there. And Ms. Bieber, Mr. Bieber. Thank you. You have five minutes, and I suppose if you want to use a couple of extra minutes, it's all right too. Great. May it please the court. I want to address two of the specific issues that were raised by appellants in their affirmative presentation, both dealing with 1677-f1d. First, appellants contend that this court has not considered that provision in the context of zeroing. That is untrue. Indeed, in U.S. Steele's reply brief, they concede as much, admitting that they've raised this exact argument before this court in a number of cases. U.S. Steele's apparent point of contention is that the court did not specifically reference that statutory provision in its determinations, but rather used language such as considering the statute as a whole, considering the legislative history as a whole. In point of fact, however, this court has considered appellants' precise arguments on section 1677-f1d on a number of occasions. On each of those occasions, they subsequently analyzed Commerce's actions under prong two of Chevron, finding that the anti-dumping statute is ambiguous as to zeroing. Turning to the substance of their specific arguments under 1677-f1d, this is the calculation examples that they provide for, namely that the three that is also untrue, and it's a flawed analysis. Basically, what U.S. Steele has attempted to do is distill a very complex anti-dumping calculation into a one-page summary. The example totally ignores— Wait, wait. I thought it was conceded that if you eliminate zeroing, that the average to average comparison and the average to transaction comparison produce the same result. Of course, it does not concede that. There are a number of specific methodologies and policies that are employed by the Department of Commerce that would render that incorrect. For example, U.S. Steele's example ignores the time periods over which weight averages are calculated. For average to average transactions, that time period is the entire period of investigation, whereas for average to transaction calculations, that time period is monthly buckets. Clearly, when you're calculating averages over different periods, that would result— If it's the same period, you get the same result, right? That could be true, but that is not how the anti-dumping laws are drafted, nor how the department calculates an anti-dumping margin. That's just one example. Other examples are the contemporaneous sales requirement, how you compare the individual transactions to the average, the monthly bucket, or the POI-wide bucket. In the average to transaction comparison methodology, that would result in specific transactions being compared to specific monthly buckets. However, in an average to average transaction, there's only one bucket, so there's not going to be any difference as to which specific U.S. sales are compared to the average normal value in the calculation. This totally ignores the transaction to transaction methodology that's also provided for in 1677 F1D. Appellants don't even address the third comparison methodology that's provided for in that statutory provision, and that is because when you do individual to individual transactions, don't use a weight average margin on the normal value side. They're pointing out that with respect to the investigations provision, which is separate, that their contention is that the change that eliminates zero, right? Correct, but the transaction... But it might still have some significance in this third category. It doesn't seem to undercut that. It's in the same provision. The transaction to transaction provision is in the same, so the elimination of zeroing would still result in a difference with respect to that comparison methodology. That doesn't seem to me to help you very much. Well, if their argument, as I assume it is, that that whole provision is rendered meaningless... Well, it doesn't make any difference whether the whole provision is rendered meaningless. If part of the change is rendered meaningless, they still have a point. And that's assuming that targeted dumping is not used, assuming that the specific calculation methodology that the department employs are ignored. I think if you simplify the transaction or the anti-dumping calculation into a one-page comparison that has no concept in reality, then appellants may be true. But the fact of the matter is in reality, there's a number of specific detailed methodologies and practices that are meant to make the dumping margin and the dumping margin. When that is taken into account, appellant's argument completely falls apart. And if you factor in the average transaction comparison methodology that's undertaken in targeted dumping, appellant's argument is further voided because in targeted dumping investigations, instead of using all the sales transactions at issue, you use a specific subset, a subset of the targeted sales. And so that fact alone renders that average-to-transaction methodology that appellants are specifically discussing, that makes their whole argument fall apart. Your final thought, Mr. Bieber? The last point that I wanted to make that has not been addressed yet this morning is this court's jurisdiction to consider the Section 123 determination. The jurisdiction of this court and the Court of International Trade below is set forth in Section 1581C and in turn 1516A. Those statutory provisions do not provide for jurisdiction for judicial review of Section 123 determinations. And I would leave the rest to our briefs on that point. Fine. Thank you, Mr. Bieber. I think Mr. Garish has a couple of minutes rebuttal. Thank you, Your Honor. May it please the court? Will you address Mr. Bieber's suggestion that even if you eliminate zeroing, there's still a difference between the average-to-average and average-to-transaction? I'd be happy to. The fact that you get the same margin result if you eliminate zeroing can be demonstrated to an absolute mathematical certainty. We've done that using an example and a mathematical proof in our brief. It has never been disputed, not once in this case. And in fact, Mr. Bieber made arguments here that he's never presented in any brief. He has not disputed it once that you get the same result, but you don't need to take our word for it or to understand the math on this. And that's because the U.S. government has repeatedly made this argument and relied on the fact that you get the same margin result if you don't use zeroing before the WTO. What they have said, and I will quote, is if offsets were required and zeroing is not used, the overall dumping margin calculated for an exporter under either the average-to-average method or the average-to-transaction method must mathematically be the same. I couldn't have said it any better myself. Now, Mr. Bieber also indicated that our argument was raised and considered by the court in Course 1. That is not the case, Your Honor. We made the argument. It was never addressed. Not one word about our argument was mentioned in the court's decision. The court completely ignored our argument. And this court's been very clear in saying that unless a decision squarely and explicitly decides an issue, there is no binding precedent on that issue. There is no binding precedent here, and this court must consider our argument under Section 1677 F1D. One final point, Ms. Burke, for the government indicated that there is a fair assumption here to be made that Congress thought that Congress would continue to use zeroing, but there's nothing in the statute. There's a gap there to be filled by Commerce. Well, they cannot fill the gap here in a way that results in an entire provision of the statute being rendered meaningless. Congress changed the statute in 1994 to require that weighted average U.S. prices be used to calculate dumping margins in normal investigations. If Commerce does not zero, that change in the statute would be rendered meaningless. The only way to give effect to that provision of the statute and to Congress's change in 1994 is to require zeroing. We would ask that Commerce's decision be overturned as a result. Thank you, Mr. Garrish. We'll be taking under advisement.